4L 469
16L 306

FANNIE TYNER et als. *v*. THOMAS B. FENNER.

1. TENANTS IN COMMON. *Bill for partition. Account for profits.* As an incident to a bill for partition, an account of profits will be ordered where one tenant has occupied and used the entire land, and is shown to have made a profit over and above the mere use, and beyond his share.

2. SAME. *Rents. Improvements.* If such tenant be charged with an occupation rent, and has cared for the property as his own, the rent should be calculated upon an average for the whole term of occupancy, and he should be allowed such usual repairs as a prudent landlord would make on his own property, or would allow to the tenant as a deduction on the rent, and for the value of permanent improvements as an offset to the occupation rent, unless the land can be, or has been, so allotted as to include the improvements in the share of the occupying tenant.

3. STATUTE OF LIMITATIONS. *Will not run against note executed to a Clerk.* The statute of limitations does not run in favor of the maker or sureties of a note executed to a Clerk for property sold in the progress of a suit in court, and while the note is in the custody of the law.

---

FROM MADISON.

---

Appeal from the Chancery Court at Jackson, H. J. LIVINGSTON, Ch.

H. E. JACKSON for Complainants.

H. W. McCORRY for Defendants.

COOPER, J., delivered the opinion of the Court.

In February, 1862, Lucy M. Fenner departed this life intestate, and the defendant, Thomas B. Fenner,

one of her children, was appointed early in the succeeding month administrator of her estate, and qualified as such.

Her heirs and distributees consisted of five children and a grandchild, the son of a deceased daughter, whose husband also survived. Richard Fenner, one of these children, died on the 27th of May, 1862, leaving surviving him his widow, Fannie, and three children, who are the complainants in this bill. Lucy M. Fenner owned at the time of her death a tract of land of about 250 acres, which she had rented to one of her sons-in-law. The son-in-law continued to occupy the land until 1867, when the defendant took possession and occupied it exclusively afterwards.

Lucy M. Fenner had under her father's will, a life estate in six slaves, with remainder in her children. Shortly after her death, the owners in remainder of these slaves filed a petition in the County Court for their sale for division, and they were sold about the 6th, and the sale was confirmed on the 8th of May, 1862. Four of the parties interested bought one of the slaves each, another was bought by one Harris, and the last by one Adams. Thomas B. Fenner purchased one of the slaves, giving his note with security for the price, payable to the clerk of the court, and he went security on each of the three notes given by the other parties interested, for the slaves bought by them. Adams and Harris each gave a note with security for the slave bought by him.

On the 1st of March, 1866, Harris paid his note originally $925, and then amounting to $1,110.39, of which $693 were paid in an account he held on Ann M. Fenner, one of the owners of the slaves, and the residue in money, for all of which the defendant gave the Clerk of the County Court a receipt. None of the other notes were ever collected, but are held by the Clerk, the suit being still pending, although no step has been taken in it, so far as appears, since the payment of the 1st of March, 1866.

This bill was filed on the 6th of October, 1874, by the widow and children of Richard Fenner, one of the sons of Lucy M. Fenner, against Thomas B. Fenner, for an account of his administration, for partition of the land, and to hold the defendant liable for the rents of the land and for the proceeds of the sale of the slaves.

The bill stated that no administration had ever been had in this State on the estate of Richard Fenner, who had resided with his family in the State of Mississippi, and asked that an administrator be appointed under the statute, if necessary.

In the progress of the suit, so much of the bill as sought an account of the defendant's administration of his mother's estate was abandoned, and the land was partitioned to the satisfaction of the parties.

The contest was narrowed down to the question of the liability of the defendant for the rents of the land, and the proceeds of the sale of the

slaves. An account was taken in the Court below upon a general reference, without adjudicating any of the rights of the parties, to which exceptions were filed by both sides.

The Chancellor acted upon these exceptions, adjudged the rights of the parties, and again referred the cause to the Master to re-cast the accounts in conformity therewith.

Both parties appealed.

A demurrer was filed by the defendant in the form of a general demurrer to the whole bill, assigning various causes, some of which went to the whole bill, and some to particular parts. It is too clear for argument, however, that the complainants, through the personal representative of their husband and father, whose appointment was asked for in conformity with the statute, were entitled to an account of the defendant's administration with a view to the recovery of their distributive shares, no objection being taken to this relief for want of parties. None of the causes assigned met this equity, and the demurrer being bad in part was bad altogether. The objection of multifariousness was taken, but, by statute, the uniting in one bill of several matters of equity, distinct and unconnected, against one defendant is not multifariousness: Code, sec. 4327.

The demurrer was properly overruled.

The bill seeks to charge the defendant with the rents of the land while in the occupation of his brother-in-law, who had been put in possession by

the intestate, and also for rents during his own occupation. It does appear that the defendant, after his mother's death, took the notes of the brother-in-law for the rents, and made some collections. To the extent of his actual collections, he is clearly bound to account to the complainants for their share. There is no ground for holding him liable beyond these collections, the tenant being shown to have been insolvent, and to have taken the benefit of the bankrupt law.

The authorities are not in accord upon the point of the liability of one tenant in common to his co-tenants for the use and occupation of the common property. We have a strong intimation that such liability exists at law in this State in the opinion delivered by Totten, J., in *Blanton* v. *Vanzant*, 2 Swan, 276. And the right to an account seems to be generally conceded in equity as an incident to a bill for partition: 1 Story Eq. Jur., sec. 655; *Hitchcock* v. *Skinner*, 1 Hoff. Ch., 21; *Backler* v. *Farrow*, 2 Hill. Ch., 111; *Pascoe* v. *Swan*, 27 Beav., 508. The mere fact of one tenant having occupied the property will not of itself make him liable for an occupation rent. The effect of such a rule would be that one tenant in common, by keeping out of the actual occupation of the premises, might convert the other into his bailiff, and prevent him from occupying them except upon the terms of paying rent: *Lorimer* v. *Lorimer*, 5 Mad., 363; *Henderson* v. *Eason*, 2 Ph., 308. It must be distinctly shown that he has

made a profit over and above the mere use, and beyond his share. It is the actual receipt of such excess which creates the liability; and, as the claim is not of strict legal right, if he is charged with an occupation rent, he should be allowed such usual repairs as a prudent landlord would make on his own property, or allow to the tenant as a deduction from the rent, and for permanent improvements, as an offset to the occupation rent. *Teasdale* v. *Sanderson,* 33 Beav., 534; *Hall* v. *Piddock,* 6 C. E. Green, 311; *Respass* v. *Breckinridge,* 2 A. K. Mar., 581; *Conklin* v. *Conklin,* 3 Sandf. Ch., 64.

The same end may sometimes be attained by allotting the land so as to make the occupying tenant's share include the improvements: *St. Felix* v. *Rankin,* 3 Edw. Ch., 323; *Brookfield* v. *Williams,* 1 Gr. Ch., 341; *Dean* v. *O'Meara,* 47 Ill., 120; *Sneed* v. *Atherton,* 6 Dana, 276. These principles are recognized by this Court in *Coleman* v. *Pinkard,* 2 Hum., 191.

The defendant did occupy the land in controversy, and receive the entire profits from 1867, and it' appears that these profits were in excess of his interest in the land. He had purchased and owned four-sixths of the land, and seems to have cultivated, improved and managed it as if it were altogether his own.

There were about 120 acres of cleared land fit for cultivation, though all of this land was not kept under cultivation every year. Before the de-

fendant went into possession, the land had rented for $250 each year, until the year or two immediately preceding, when it rented for $300. For a series of years of varying seasons, where the land was not cultivated to its utmost capacity, the latter figures are a full rent. The Clerk and Master erred, therefore, in charging the defendant with $350 a year. Interest in such cases, where 'no demand has been made before suit brought, is not a matter of right, and ought not to be allowed during the war, the complainants then being within the Confederate lines, and the land and the defendant within the Federal lines. On the other hand, no interest should have been allowed on the value of the permanent improvements. The result of these changes will be to reduce the balance found by the Clerk and Master. We find that the amount due as of this date will be about $650, and we fix upon that sum as a near approximation to the true amount without further account.

It was agreed by the parties that the sale of the negroes by the Clerk of the County Court was duly reported and confirmed on the 8th of May, 1862, and the title of the slaves divested out of the owners and vested in the purchasers by the same decree. It was further agreed that the cause in which the sale was made is undisposed of, and still pending; that the note given by the defendant, and the notes on which he became security, are unpaid, the makers of the last

three notes being either dead or non-residents of the State; and, further, in order to avoid the necessity and expense of separate proceedings in the County Court to enforce the collection of the notes, or the necessity of complainants amending their bill, that complainants, or either of them, may, to the extent of their interests in said notes or the fund they represent, have the same included in the account herein ordered, and charge the defendant as the joint maker of said notes, with the amount of their share or interest in the same, provided the defendant could be made liable thereon by any appropriate proceedings against him for the payment thereof in the County Court, subject, by way of exceptions to the charge, to any defense which the defendant conld make against the payment of said notes under proper proceedings in the County Court for their collection.

This Court has held that the statute of limitations does not run in favor of the maker or sureties of a note executed to the Clerk for property sold, or other sufficient consideration, in the progress of a cause, and while the note is in the custody of the law: *Owen* v. *Nelson,* Dec. Term, 1874, at Nashville, cited in *Gold* v. *Bush,* 4 Bax., 579. The reason is, that the parties to such instruments by their execution and delivery to the Court, become parties to the suit, so that proceedings may be taken against them without notice, and they may appear and defend, and have the benefit of proceedings for the correction of errors.

In this view, the original suit in the County Court being still pending and the notes themselves in *custodia legis*, the right of any party interested in the proceeds of the sale of the slaves to go into the County Court and enforce the collection of the notes seems to be clear, unless there is something else in the case which will enable the defendant to resist their payment.

The defendant says, in his deposition, there being no other evidence on the subject, that there were six negroes, and the parties interested agreed each to buy a negro, and thus easily arrange the matter among themselves. One of the parties, Ann M. Fenner, was indebted to N. G. Harris, and agreed that he might buy her negro and pay himself out of the proceeds. Harris did, accordingly, buy one of the negroes, and give his note for the price, and defendant, having bought his sister's interest, settled with Harris on the 1st of March, 1866, taking up Harris' debt against his sister, which the latter had agreed to receive in part consideration for her share. "My brother Richard," says the witness, "was in the army at Corinth at the time, and could not get here to the sale, and wrote me word to buy him the girl, Polly, which I did for him. Some month or two after the sale he came home sick, and, as he could not send the negro to his house, in Mississippi, he asked me to take her, and he would take the Adams note instead of the girl, to which I agreed. I took and kept the girl."

Unfortunately, or perhaps fortunately for the defendant, he had stated in his answer that Richard Fenner had sent word to have a negro bought for him, but, the other heirs, not caring to assume the responsibility, did not do so, and one Adams purchased the other negro, and, as respondent supposes, complied with the terms of sale.

Adams' note, with security, is produced by the Clerk, showing that the terms of sale were complied with by him. And the defendant, in answer to the very next question put to him, as a witness, says, "I mean that Adams bought the negro which I was to buy, he paying or bidding more than I was willing to pay, and he (meaning Richard Fenner) agreed to take that note instead of the negro girl."

The witness does not, however, explain what he means by saying that he took and kept the girl. The sale of the slaves was on the 5th of May, 1862, and the defendant says elsewhere in his deposition that Richard Fenner died early in June, the bill says the 27th of May, 1862. It is very clear that time has obscured the defendants recollection, and that Richard Fenner made no arrangement on the subject. But if he ever did agree to take the Adams note it was an agreement never carried out, not binding for want of consideration, and because not made with the parties having a right to control the Adams note. The witness admits that he, and perhaps the husband of one of his sisters, were alone present at the alleged conversation. There

is nothing in the statements of the witness to bar the father, if alive, or his representatives from claiming his proportion of the proceeds of sale.

His share would be one-sixth. The Adams note has never been collected, and as the defendant is no more in fault for the failure to collect it than any of the other parties, he cannot be held liable for any part of it. Nor can he be held liable for so much of the Harris note as was paid in the account of Ann M. Fenner. To this extent, the consideration was paid to her, although through the hands of the defendant, and she is not before the Court so as to enable the Court to adjust the equities between the parties.

The complainants, as we have already seen, resided within the Confederate lines during the war, and the defendant within the Federal lines, and no interest ought to be charged against him, except such interest as may have been included in the payment made to him by Harris, up to the 1st of July, 1865.

It appears in the record that Richard Fenner became a purchaser of personal property at the administration sale of the defendant, and it was the fact, no doubt, that his liability in this regard exceeded his share of those assets that occasioned the abandonment of the administration account. The defendant has long since became liable for the amount due to the distributees by reason of this note. He ought, under the circumstances, to have a credit in this account for any excess of Richard

Fenner's debt over his share of the personal estate. Strictly speaking, the notes for the sale of the slaves could only be enforced in the name of a personal representative of Richard Fenner. He was a non-resident of the State at his death, and there has been no one in this State against whom suit could have been brought to enforce the collection of the claim held by the defendant against him. The action was not barred at the time when the act of 1865, chap. 10, sec. 8, (Code, sec. 2762*b*,) was passed. By this act the time of absence or residence out of the State is not to be counted as any part of the time limited for the commencement of the action. The amount of Richard Fenner's purchases was $502.90. The share of his representatives, was found by the Master, on the 15th of December, 1876, calculating interest on the debits and credits to that date, to be $356.10. By calculating interest on the former sum from the date of sale, or expiration of the credit given without interest, to that date, and deducting the latter sum, the remainder, with interest from the 15th of December, 1876, to the date of ascertaining the defendant's indebtedness on the slave notes, would be a proper credit to be deducted from the latter debt.

The Chancellor's decree will be reversed, and a decree entered in accordance with this opinion, and a reference made to the Clerk to recast the accounts as directed.

The defendant will pay the costs.