IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 1, 2021 Session

## MARN SUZANNE LARSEN-BALL v. WILLIAM GORDON BALL

**Appeal from the Chancery Court for Knox County**
**No. 166176-2     Gregory S. McMillan, Judge**

_____

**No. E2020-00297-COA-R3-CV**

_____

In this post-divorce action concerning enforcement of the trial court's order distributing the parties' marital property, the trial court ultimately awarded a judgment to the wife in the amount of $206,868.67. The court also ordered that the wife would be entitled to a certain portion of the proceeds from the sale of the parties' former marital residence. The court dismissed the wife's contempt claims and declined to award interest or attorney's fees. The husband has appealed. Having discerned two relatively minor errors in the judgment, we modify the amount awarded to the wife to increase it by $18,525.24, enlarging the trial court's award to the wife to the total of $225,393.91 rather than $206,868.67. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Gordon Ball, Nashville, Tennessee, Pro Se, and Thomas C. Jessee, Johnson City, Tennessee, for the appellant, William Gordon Ball.[1]

Corrin P. Fulton, Chattanooga, Tennessee, for the appellee, Marn Suzanne Larsen-Ball.

## OPINION

### I. Factual and Procedural Background

Marn Suzanne Larsen-Ball ("Wife") and William Gordon Ball ("Husband") were divorced by an order of the Knox County Chancery Court ("trial court") entered on

---

[1] Respectfully, we note that Mr. Jessee passed away during the pendency of this appeal.

September 3, 2007. Although the parties had stipulated that Wife was entitled to a divorce on the ground of inappropriate marital conduct and had entered into an agreed parenting plan with respect to their children, the court was tasked with equitably dividing the parties' marital estate valued at over $29,000,000.00.

As part of that equitable distribution, the trial court awarded to Wife certificates of deposit valued at $5,783,258.00; Wife's then-current condominium residence valued at $950,000.00; and various vehicles and items of personalty. The court also ordered that other marital real properties be sold and that Wife would receive one-half of the proceeds from the sale of those properties, which had a collective net value of $5,603,251.00. The marital properties ordered to be sold included the parties' former marital residence on Old Kent Drive; five condominiums in Destin, Florida, known as Marbella, Kelly Plantation, Waterview, Poolside, and East Pass; and an office condominium in the Bank of America building in Knoxville. The court further ordered that if any of the above-listed properties had not been sold within eight months of the date of entry of the final decree, either party could demand that such property be auctioned. In addition, Husband was directed to pay to Wife the sum of $3,000,000.00 in order to render the distribution of property equitable.[2]

On October 3, 2007, the trial court entered an order clarifying that Husband would be responsible for the maintenance fees for the marital properties ordered to be sold and would be entitled to a one-half credit for such expenses upon the properties' sales. Subsequently, on May 12, 2009, following the sale of the Bank of America office condominium, the trial court entered an agreed order stating that the parties would deposit the funds from that sale into a joint "rental" checking account, from which the parties would pay "maintenance fees and real estate taxes" concerning the Florida properties. The trial court further ordered that checks written on said account would require the signatures of both parties.

On September 12, 2016, Wife filed a complaint in the trial court, alleging that Husband was guilty of criminal contempt. Wife asserted that although the trial court had directed that the parties' former marital residence on Old Kent Drive be sold and the proceeds divided equally, Husband had failed to do so. Wife explained that Husband continued to live in the home on Old Kent Drive and had neither sold it nor paid respective rent to Wife. Wife also asserted that Husband had quitclaimed his interest in the Kelly Plantation condominium to the Gordon Ball Revocable Living Trust ("the Trust"), for which Husband was the trustee. According to Wife, Husband later sold that property for $1,030,000.00 and failed to give Wife her share of the proceeds. Wife also claimed that Husband had failed to provide to her one-half of the parties' University of

---

[2] Our Supreme Court affirmed the trial court's equitable distribution of the parties' marital property on appeal in *Larsen-Ball v. Ball*, 301 S.W.3d 228, 237 (Tenn. 2010).

- 2 -

Tennessee basketball tickets and one-half of a $750,000.00 note payable, as directed by the trial court's decree.

Wife sought entry of a judgment against Husband, as well as a finding of contempt, and requested that Husband be imprisoned until he purged such contempt. Wife concomitantly filed a complaint against Husband alleging civil contempt, wherein she asserted the same allegations as contained in her criminal contempt claim. Wife subsequently filed a motion seeking to amend her civil contempt claim to add the Trust as a party defendant and to add a claim for punitive damages predicated upon the alleged fraudulent conveyance of the Kelly Plantation property. The court granted the motion to amend by order entered on January 10, 2017.

On November 3, 2016, Husband filed answers to the complaints, denying liability and asserting the affirmative defenses of laches, waiver, and estoppel. Husband concomitantly filed a counterclaim, asserting that the trial court had failed to address a substantial debt owed by the parties in its distribution of the marital estate. Husband claimed that Wife should be responsible for one-half of this debt, or $2,025,000.00. Husband further claimed that he had advanced considerable sums of money to maintain the parties' various properties and ready them for sale, such that Wife currently owed him approximately $165,443.85 according to his calculations. Wife filed an answer to Husband's counterclaim, denying that Husband was entitled to any relief and also asserting various affirmative defenses, including equitable estoppel, laches, expiration of the statute of limitations, and accord and satisfaction.

On March 17, 2017, Husband filed an answer to Wife's amended complaint, denying that the transfer of the Kelly Plantation property was fraudulent. Husband subsequently filed summaries of evidence pertaining to the sales of certain of the parties' real properties, detailing the monies received from the sales and the expenses paid to maintain the properties until they were sold.

On August 1, 2017, Husband filed a motion seeking to sell the Old Kent Drive property at public auction. Husband concomitantly filed a motion seeking to renew the parties' final judgment pursuant to Tennessee Rule of Civil Procedure 69.04. Thereafter, on August 28, 2017, Husband filed a motion seeking dismissal of Wife's complaint of criminal contempt for failure to state a claim and lack of notice. Husband also filed a motion seeking enforcement of the final judgment and specifically sought an order directing Wife to relinquish a diamond earring to Husband that was awarded to him in the parties' divorce.

Wife filed responses to Husband's motions, opposing the sale of the Old Kent Drive property at public auction by claiming she would be prejudiced thereby and denying that Husband was entitled to the diamond earring because he had allegedly gifted it to Wife after their divorce. Wife then filed a motion to amend, seeking to add a claim

that Husband had failed to give her an equal share of the proceeds from the sales of the parties' properties following their divorce. Wife also filed a response opposing Husband's motion to dismiss.

The trial court conducted a hearing on April 23 and 24, 2018, wherein the court heard testimony from both parties as well as a real estate appraiser hired by Wife. On November 5, 2018, the trial court entered an order dismissing Wife's claim of criminal contempt. Husband thereafter filed a motion seeking to have Wife's claim of civil contempt dismissed as well. Wife opposed the motion, stating that the trial court had bifurcated the hearings on criminal contempt and civil contempt. The trial court denied Husband's motion by order dated January 9, 2019.

The trial court continued to consider this matter on January 22 and 23, 2019, taking additional testimony from both parties. Upon the conclusion of the hearing, the court invited both parties to file proposed findings of fact and conclusions of law. In March 2019, each party did so. In addition, each party respectively responded to the findings and conclusions filed by the opposing party.

On July 16, 2019, the trial court entered an order, finding that the parties' divorce decree had directed several parcels of the parties' real property to be sold and the proceeds divided. The court found that this did not occur in a timely fashion such that the court was required to review an accounting of expenses incurred for each property in the years following the divorce. The court ultimately adopted the accounting presented by Wife, determining that Husband's records did not "provide the level of detail to allow the Court to find that he should [] receive credit for all of his claimed expenses for maintenance, upkeep, and utilities related to the various properties." The court also determined that Husband had maintained control of the parties' joint rental account and received all bank statements related thereto.

The trial court made detailed findings concerning the sale price and expenses related to each parcel of property, ultimately determining that Husband owed Wife the net sum of $116,006.34 following the sales of the various properties. Concerning the Old Kent Drive property, which was the only parcel of marital property that had not been sold, the court found that it had been appraised at a value of $880,000.00 and ordered that if the parties could not agree to list the property for sale with a realtor of their choice, the property would be sold at auction. The court directed that the proceeds from the sale be applied first to sale costs, indebtedness on the property, and property taxes. The court also directed that the remaining proceeds be split between the parties, with Wife receiving 43.75 percent and Husband receiving 56.25 percent. The court noted that Wife should receive one-half of the value of the home without improvements, or $335,000.00, and that Husband should receive the remainder.

- 4 -

The trial court denied Wife's claim for her share of the fair market rental value of the Old Kent Drive property. The court awarded to Husband $43,404.15 for one-half of the property taxes paid and deducted that amount from the $116,006.34 judgment previously awarded to Wife. The court denied Husband's claim for reimbursement of homeowners' association fees, determining that Husband had failed to prove the payment of such fees. The court also denied Husband's claims for reimbursement of utility costs, lawn care, pool care, pest control, insurance, and repairs related to the Old Kent Drive property. The court declined to award pre-judgment interest or attorney's fees to either party based on the totality of facts and circumstances in the case, as well as the court's finding that the parties had "acted as they pleased in disregard of the Court's order."

Wife filed a motion to alter or amend, pointing out that the trial court had failed to rule on various disputed items of personalty, as well as her claims for civil contempt and post-judgment interest. Husband likewise filed a motion to alter or amend, arguing that the trial court had failed to award him proper credit for all amounts he had previously paid to Wife, failed to consider debt that he had incurred in purchasing certain properties, and failed to determine the fate of the diamond earring. Wife subsequently filed an amendment to her motion, asking the court to specify that a mechanic's lien on the Old Kent Drive property be paid from Husband's share of the proceeds.

On February 4, 2020, the trial court entered an order concerning the motions to alter or amend. The court noted that during the telephonic hearing on the motions, Wife had withdrawn her amended motion. The court denied Wife's claim of civil contempt and thus declined to award any related sanctions. However, the court awarded to Wife an additional judgment in the amount of $144,266.48, representing Wife's net share of monies that were withdrawn from the joint rental account by Husband to pay an interest payment not authorized by the court's prior orders.

The trial court denied Wife's claim for post-judgment interest because no previous court order had awarded her monetary damages related to the marital properties ordered to be sold. The court determined that the diamond earring given to Wife by Husband following the divorce was Wife's property. Concerning Husband's claim that he was due credit for two checks written to Wife totaling $590,000.00, the court found that the $570,000.00 check had been repaid by Wife because the Internal Revenue Service ("IRS") determined such payment to be an improper distribution from Husband's pension plan. The court therefore determined that Husband should not receive credit for this payment. The court did find, however, that Husband should receive credit for the $20,000.00 check. After dividing the proceeds from the East Pass property between the parties and considering the additional payment from Husband to Wife in the amount of $20,000.00, the court awarded Wife a net total judgment of $206,868.67.

The trial court determined that Husband was not entitled to a credit for the SunTrust loan against the proceeds from the Kelly Plantation property because the

SunTrust loan was not a lien upon title to that property. Furthermore, the court found that this debt was addressed in the 2007 final order, which stated that Husband would be solely responsible for the debt and did not order that it be satisfied from the Kelly Plantation proceeds. The court declined to award attorney's fees to either party and assessed court costs equally. Husband timely appealed.

## II. Issues Presented

Husband presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by declining to award Husband reimbursement for all expenses he incurred in maintaining the parties' properties until their respective sales.

2. Whether the trial court erred by declining to award Husband reimbursement for one-half of the interest he incurred and paid on two interest-only loans that were used to purchase two of the Destin properties.

3. Whether the trial court erred in determining that Husband had kept all of the proceeds from the sale of the East Pass condominium.

4. Whether the trial court erred in determining that Husband owed Wife monies from the joint rental account.

Wife presents the following additional issues, which we have also restated slightly:

5. Whether the trial court erred in failing to find Husband in contempt and thereby award Wife damages and attorney's fees.

6. Whether the trial court erred in denying an award of post-judgment interest to Wife on the funds Husband retained from the sales of the parties' properties.

7. Whether the trial court erred in denying Wife's request for one-half of the fair market rental value of the Old Kent Drive property for the time period when Husband solely occupied and profited from that property.

8. Whether the trial court erred in determining that the overpayment Wife received concerning the Waterview condominium via a Qualified Domestic Relations Order was not a gift.

- 6 -

9.      Whether the trial court erred by awarding to Husband credit for paying Poolside taxes when all of the taxes were proven to have been paid by Wife, paid jointly, or paid from the sale of the property.

## III.  Standard of Review

We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise.  *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).  "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect."  *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006).  We review questions of law *de novo* with no presumption of correctness.  *See Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV.  Reimbursement of Expenses

Husband argues that the trial court erred by declining to award him reimbursement of all expenses he incurred in maintaining the parties' real properties in Florida.  According to Husband, although he incurred expenses totaling $510,104.35 in maintaining these properties until the time they were sold, the trial court only allowed reimbursement of $235,900.16.  Husband asserts that he should have been reimbursed for the remaining expenses of $274,204.19, alleging that these expenses were supported by the same manner of proof as those that were allowed by the court.

Wife contends that the difference in the amount of expenses claimed by Husband and the amount awarded by the trial court can be attributed to the evidence presented at trial, which demonstrated that:  (1) many of the expenses for which Husband sought reimbursement were paid from the parties' joint rental account such that the parties had already shared those expenses equally, (2) certain of the expenses claimed by Husband were shown to have been paid personally by Wife, (3) certain of the expenses claimed by Husband were paid from rental income received from the properties that Husband did not share with Wife, (4) certain of the expenses claimed by Husband were incurred prior to the divorce or deducted from the proceeds of the sale of the respective property such that those amounts had already been shared equally, and (5) Husband had failed to provide sufficient proof to substantiate certain claimed expenses.

The trial court's July 16, 2019 order specifically addresses each of the parties' Florida properties, delineating a detailed accounting of the proceeds received from the sale of each parcel and the expenses claimed by Husband with regard to taxes, repairs, utilities, homeowners' association ("HOA") fees, and similar obligations that related to the respective property. The trial court noted at the beginning of the order that "Mr. Ball's records simply do not provide the level of detail to allow the Court to find that he should [] receive credit for all of his claimed expenses for maintenance, upkeep, and utilities related to the various properties." In its analysis relative to each property, the court explained the basis for its findings concerning Husband's claimed expenses and whether they were appropriate for reimbursement to Husband.

Our review of the trial court's commendably thorough and detailed order, along with the evidence presented at trial, demonstrates that the trial court's findings, which are too lengthy to completely recount verbatim here, were supported by the evidence presented and the trial court's credibility determinations. We agree with Wife's characterization of the trial court's ruling, noting that the trial court chose to exclude certain expenses claimed by Husband from consideration because Wife had demonstrated that (1) she had already paid one-half or more of the claimed expense, (2) the expense pre-dated the parties' divorce or was paid from the sale of the property, or (3) the expense was not sufficiently substantiated.

By way of example, we quote the following excerpt from the trial court's July 16, 2019 order with respect to the parties' East Pass property:

**East Pass** -- This property was sold on October 25, 2011 for $425,000.00. The net proceeds received were $389,092.38. [Husband] kept all of the proceeds from this piece of property.

**Expenses:**

[Wife] paid the property taxes for 2007-2010 in the amount of **$34,120.04**.

[Husband] claims that he paid $42,043.73 for HOA fees and is entitled to credit for this amount. Of the sum he claims was paid, $21,538.06 was paid from the parties' joint rental account and each party is deemed to have paid one-half of that amount. An additional $4,000.00 of HOA fees was paid using one of [Husband's] personal accounts. The source of the funds in that account was proceeds from rentals of other pieces of rental property also subject to the Court's order requiring sale. Deducting those two sums leaves a claim for $16,505.67. Finally, that sum includes a payment of $741.34 made prior to the Court's order. The amount [Husband] paid, is therefore, $15,764.29. At the time of the sale, the HOA fees were not current. $1,721.30 was deducted from the gross sales proceeds to satisfy

that obligation. [Wife] should not be required to pay any portion of the late fees resulting from [Husband's] failure to meet his obligations under the Court order. Rather than adding that sum back into the net proceeds of the sale, the Court will simply deduct it from the amount of HOA fees the Court finds that [Husband] paid. The final credit due to [Husband] for HOA fees is **$14,042.99**.

[Husband] has introduced evidence of a number of repairs to East Pass. The evidence established that those funds were paid from the parties' joint rental account and therefore each party is deemed to have paid their share and no additional credit or deduction is appropriate.

From the net proceeds of $389,092.38, each party was to receive one-half. Offsetting the amount due from [Husband] to [Wife] for property taxes against the amount she owes to him for HOA fees yields a result that [Wife] is owed $10,038.53 more of the proceeds than [Husband]. ($204,584.72 to [Wife] and $184,507.66 to [Husband].)

We reiterate that the trial court's factual findings quoted above, similar to the totality of the court's findings concerning the properties' proceeds and expenses, are supported by a preponderance of the evidence.

Quoting this Court's decision in *Steakin v. Steakin*, Husband argues that the trial court failed to make adequate factual findings "necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *See* No. M2017-00115-COA-R3-CV, 2018 WL 334445, at *4 (Tenn. Ct. App. Jan. 9, 2018) (*quoting In re Estate of Oakley,* No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *10 (Tenn. Ct. App. Feb. 10, 2015)). Husband's argument in this regard is unpersuasive. Our thorough review of the July 16, 2019 order demonstrates that the trial court's factual findings were detailed, sensible, and complete.

Husband's characterization of the trial court's disallowance of certain claimed expenses as based solely on a lack of receipts or documentary proof is similarly unavailing. As previously explained, the trial court found that a substantial portion of the expenses for which Husband sought reimbursement were paid from the parties' joint rental account, thereby demonstrating that Wife had already paid her proportionate share. Others were shown to have been paid solely by Wife, out of the sale proceeds at closing, or prior to the parties' divorce. Moreover, Husband acknowledged at trial that Wife should be afforded proper credit in all such instances. We therefore determine Husband's first issue to be without merit.

V.  Reimbursement of Interest Obligations

Husband asserts that the trial court erred by declining to award him reimbursement for one-half of the interest he paid concerning two loans that were purportedly incurred in order to purchase two of the parties' Florida properties.  According to Husband, the parties obtained an interest-only loan in order to purchase Marbella in 2006, and they obtained another interest-only loan to facilitate the purchase of Kelly Plantation in 2007.  Husband contends that both loans automatically renewed on an annual basis until the principal was paid.  Husband posits that because he made interest payments on these loans totaling $651,463.18 from the date of the parties' divorce until such time as the loans were paid off, the trial court should have ordered Wife to reimburse him for one-half of that amount.

Wife contends that the trial court properly declined to award Husband reimbursement for these interest payments because (1) the proof demonstrated that Husband had almost completely paid off the Kelly Plantation loan before taking another advance following the parties' divorce; (2) the trial court's September 3, 2007 order stated that the loan on Kelly Plantation would be paid from the sale of the property and made no provision for interest payments; and (3) the trial court's September 3, 2007 order further provided that all other marital debts would be paid by Husband.  We agree with Wife and affirm the trial court's declination to award reimbursement of these interest payments to Husband.

As a reference point, the trial court's September 3, 2007 order provided:

The property at 7001 Kent Road; Marbella; Bank of America Office Condominium; Unit 1403, Kelly Plantation; Unit 623, Waterview Towers Yacht Club; Unit 104, Poolside Villa; and 404 East Pass Towers with a total value of $6,742,338.00 shall be sold by the parties.  There is a debt on Kelly Plantation for $1,009,087.00 and loan for $130,000.00.  These debts shall be discharged by the sale of these properties.  Leaving a net value of $5,603,251.00.  The parties shall share equally in the proceeds of the sale and to commission, taxes and any other costs of sale.  If one or more of the properties have not sold within eight months of the final judgment, either party has a right to demand a sale at auction.

* * *

The husband shall have the remainder of the marital property listed on Exhibit One and any outstanding debts not heretofore covered in this judgment.

(Paragraph numbering omitted.) Aside from the debts previously addressed in the September 2007 order, the parties' list of marital assets and liabilities entered at the time of their divorce identifies only one other debt: a loan from SunTrust Bank in the amount of $2,791,627.00 with the notation, "Airplane/Marbella."

As the trial court found in its July 2019 order, the proof at trial demonstrated that the debt on Kelly Plantation for $1,009,087.00 had been largely paid off in 2008. Accordingly, the court stated:

> The proof at trial was that the debt on Kelly Plantation at the time of divorce was $1,009,087. [Wife] established that a payment of $1,000,000.00 was paid on the SunTrust line of credit on June 5, 2008, leaving a principal balance of $10,143.12. Thereafter, [Husband] took out a new advance on or about October 10, 2008, without [Wife's] knowledge or approval. The new amount was $1,250,000.00. [Husband] is not entitled to collect any additional principal or interest owed associated with the new advance.

The evidence at trial preponderates in favor of the trial court's findings. Inasmuch as the loan regarding Kelly Plantation had been almost completely satisfied on June 5, 2008, we agree with the trial court's decision not to award Husband reimbursement of interest paid on this loan when considering that he made the unilateral decision to increase the balance of the loan following the parties' divorce.

Moreover, with regard to Husband's allegations concerning a loan tied to the purchase of Marbella, we note that the only other debt referenced in the parties' list of marital assets and liabilities entered at the time of their divorce was a loan from SunTrust Bank in the amount of $2,791,627.00 with the notation, "Airplane/Marbella." Inasmuch as this debt was not specifically discussed in the trial court's September 3, 2007 order, it necessarily falls into the category of "any outstanding debts not heretofore covered in this judgment," thereby rendering it Husband's sole responsibility pursuant to that judgment. Therefore, because the loans at issue were either satisfied directly following the parties' divorce or were Husband's sole responsibility, we affirm the trial court's determination that Husband was not entitled to any reimbursement from Wife for interest payments on these loan obligations.

## VI. East Pass Condominium

Husband contends that the trial court erred in its determination that Husband had retained the proceeds from the sale of the East Pass Condominium. In its July 2019 order, the trial court found that the East Pass property had been sold on October 25, 2011, and that Husband had received the net proceeds of $389,092.38 without making any

payment of the proceeds to Wife. The court then proceeded to address the expenses related to East Pass for which Husband was due reimbursement.

Husband appears to argue in his appellate brief that because he wrote a check to Wife in 2012 for $570,000.00 from his law firm's pension fund "for her one-half of the proceeds from both East Pass and Waterview combined," the trial court's determination that he retained the proceeds from East Pass was in error. However, the proof at trial was undisputed that Wife repaid $570,927.11 to the pension fund later that year due to an "IRS audit." Subsequently, the parties entered into a qualified domestic relations order ("QDRO") providing that Wife would receive a distribution from the pension fund. Wife ultimately received $431,098.82 from the pension fund, which amount the trial court credited toward Wife's portion of the Waterview sale proceeds.

Husband also tendered a check to Wife in 2011 for $20,000.00, which was credited toward the amount Husband owed to Wife from the sale of East Pass in the trial court's February 4, 2020 order. As such, we determine Husband's third issue to be without merit.

## VII. Joint Rental Account

For his final issue, Husband argues that the trial court erred in determining that he owed monies to Wife regarding the parties' joint rental account. Husband contends that when this account was opened in 2008, an initial deposit of $386,903.03 was placed in the account from the sale of the Bank of America office condominium. Husband acknowledges that during the ensuing years, rental income from the parties' properties was also deposited in this account. Husband asserts, however, that the expenses for the parties' properties exceeded the combined income and that any shortfall was paid from his personal funds. Husband posits that the trial court therefore should not have awarded to Wife any portion of the parties' joint rental account.

With regard to the joint rental account, the trial court specifically found as follows:

Bank of America Rental Property Account - This account was established with an initial deposit of $386,903.03 on May 29, 2008. [Husband] testified that there was rental income of $140,818.36 received from the various investment properties prior to their sale. [Husband] further testified that there was $140,818.36 in rental income. The total account balance according to [Husband's] figures would have been $527,721.39. According to [Wife], the total deposits into the account were $554,176.88. There was no testimony by either party to explain the discrepancy, and the underlying documents (bank statements, deposit records, etc.) were not introduced into evidence. In reviewing the documents provided by [Husband], page 2 of the statement for the Bank of

- 12 -

America statement shows deposits for May and June 2008. The figures on that statement cannot [be] reconciled with page 14 of Exhibit 14 ([Wife's] summary of transactions from the Bank of America Joint Rental Account). The Court finds that the bank statement is the more credible and will use [Husband's] total value of $527,721.39 for the total value of sales proceeds from the condominium and deposits for rental income. There is no dispute that [Husband] removed the sum of $314,988.45 in June 2009 to make an interest payment that was not an approved use for the funds held in the account.

Exhibit 14 lists the expenses for the rental properties that [Wife] determined were properly allowable and those for which no credit was due. The Court finds that the expenses for utilities, cleaning, and repairs disputed by [Wife] were appropriate and declines to find [Husband] solely responsible for those. Taking the total received ($527,721.39) and subtracting from it the withdrawals the Court finds to be appropriate ($181,551.79 and $54,398.37 (total of disputed expenses the Court has approved)) leaves $291,771.23 that should have been divided between the parties and was not. Each party should have received $145,885.615. Had [Husband] not taken the interest payment, these funds would have been in the account to be distributed, and he owes this amount to [Wife].

There is a credit to be applied before the final amount owed is determined. [Wife] closed the account and received $3,238.27. She owes one-half of that amount ($1619.14) back to [Husband]. Applying that credit to the amount owed by [Husband] leaves a net amount of $144,266.48 due from him to [Wife]. [Wife] is hereby awarded a judgment against [Husband] for that amount in addition to the amounts previously determined to be owed in the Court's July 2019 Order.

Again, we determine the trial court's findings to be supported by the proof with one exception: contrary to the trial court's finding regarding deposits into the rental account in 2008 and 2009, Wife presented documentary evidence in the form of a validated deposit slip evincing that $30,000.00 was deposited into the rental account in 2011 when the Waterview boat slip was sold. In fact, the trial court found this to be true in its July 2019 order, noting that "proceeds from the sale of that boat slip were put into the parties' joint rental account. Based upon the use of that account to pay joint operating and repair expenses, no further action needs to be taken regarding the boat slip proceeds." As such, we determine that Wife presented proof that deposits totaling $557,721.39 had been made to the parties' joint rental account.

Incorporating this deposit total into the trial court's calculation, we determine the appropriate amount to be divided between the parties would be $321,771.23 rather than

$291,771.23. Accordingly, Wife's half is $160,885.62, and after applying Husband's credit of $1,619.14 due to Wife's withdrawal of the account's balance at closing, Wife is due an award in the amount of $159,266.48. We therefore modify the trial court's judgment to substitute $159,266.48 in place of the trial court's award of $144,266.48, which increases Wife's ultimate judgment by $15,000.00. Moreover, to the extent that Husband argues that he deposited additional funds into the joint rental account to cover expenses for the parties' properties, we note that Husband has failed to direct this Court to any evidence in the record substantiating this claim.

## VIII. Civil Contempt

Wife argues that the trial court erred by failing to hold Husband in civil contempt for his willful disobedience of the trial court's previous orders. Wife postulates that Husband's willful disobedience was demonstrated by proof presented at trial that he (1) retained funds from the sale of marital properties and failed to provide Wife her share of the sale proceeds; (2) failed to provide Wife with her half of the University of Tennessee basketball tickets; and (3) wrote an unauthorized check from the joint rental account in the amount of $314,988.45, along with other checks that Wife did not sign or authorize.

As our Supreme Court has previously explained:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008) (footnotes omitted). In the case at bar, Husband has not argued that the trial court's prior orders were unlawful or that the orders failed to be "clear, specific and unambiguous." The trial court found that although Husband had disobeyed certain provisions of the trial court's previous orders, such disobedience was not shown to be willful. Following our review of the evidence presented, we agree.

The issue of whether a party who is charged with civil contempt actually violated a court order is a "factual one to be decided by the court without a jury," and the trial court's determination concerning this issue should be reviewed under the standard provided in Tennessee Rule of Appellate Procedure 13(d). *Id*. at 356. Similarly, "[d]etermining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding 'willfulness' should be reviewed in

accordance with the Tenn. R. App. P. 13(d) standards." *Id*. at 357. As this Court has further explained:

> "Willfulness" in the context of civil contempt does not require the same standard of culpability required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Tr.*, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006) (internal citations omitted). *See Konvalinka*, 249 S.W.3d at 357.[3]

> With regard to the parties' marital properties, the trial court found that after
>
> reviewing the parties' dealings, the Court found that [Husband] owed [Wife] the sum of $116,006.34 to equalize the sales proceeds of the various investment properties. This amount was determined after all the various claims of each party concerning the properties had been reviewed and the equities determined. Had the Court held in [Husband's] favor on some of his claims for credit, [Wife] would have owed [Husband] money. After reviewing the totality of the proof, the Court does not find that [Husband] willfully and intentionally failed to comply with the Court's orders regarding the investment properties.

---

[3] In *Konvalinka*, our Supreme Court further elucidated:

> After determining that a person has willfully violated a lawful and sufficiently clear and precise order, the court may, in its discretion, decide to hold the person in civil contempt. The court's decision is entitled to great weight. Accordingly, decisions to hold a person in civil contempt are reviewed using the abuse of discretion standard of review.

249 S.W. 3d at 358 (internal citations omitted). "A trial court's <u>use</u> of its contempt power is within its sound discretion and will be reviewed by an appellate court under an abuse of discretion standard." *State ex rel. Groesse v. Sumner*, 582 S.W.3d 241, 250 (Tenn. Ct. App. 2019) (emphasis added) (*quoting McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *3 (Tenn. Ct. App. May 28, 2010)). We reiterate, however, that the standard of review applicable to the trial court's factual determinations of whether a party violated a prior order and whether such violation was willful are reviewed pursuant to the standard found in Tennessee Rule of Appellate Procedure 13(d): "review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *See Konvalinka*, 249 S.W.3d at 356-57; *see also* Tenn. R. App. P. 13(d).

We agree. According to Husband's calculations, he was due money from Wife related to maintaining the properties, but many of his expenses were disallowed by the trial court.

The evidence demonstrated that Husband provided Wife with some funds from the sale of the properties, including the ill-fated payment from his pension fund that Wife later repaid and which was replaced in part by a subsequent payment from the pension fund following entry of the agreed QDRO. Husband presented summaries of expenses that he had defrayed for the parties' properties, some of which were paid from his own funds. Husband asserted at trial that Wife had received her entitled share. Even though the trial court ultimately determined that Husband owed a judgment to Wife, it appears that prior to such determination, Husband truly believed that Wife had received sufficient payment. Therefore, we find that the evidence supports the trial court's determination that Husband's failure to pay the full amount owed was not willful.

With regard to the University of Tennessee basketball tickets, the trial court's September 3, 2007 order provided that "wife shall receive one-half of the sky box football tickets and men's and women's basketball tickets." The trial court's subsequent October 3, 2007 order clarified that "[Husband] shall forthwith deliver to [Wife] one half of the season tickets to University of Tennessee football games. Each party shall be entitled to one half of the total tickets per game. [Wife] shall be responsible for her share of the cost of the 2008 tickets and her share of the upcoming 2007 basketball tickets."

Concerning the basketball tickets, the trial court found:

At trial, [Husband] testified that, in order to have the ability to purchase tickets, he must make an annual donation to the University. The Orders from 2007 require [Wife] to pay the cost of the tickets addressed in the Order. The 2007 Orders do not specify whether the donation is included in the "cost" of the tickets or if the Court was just requiring [Wife] to pay the face value of the ticket assigned by the University for each game. [Wife] takes the position that she should not have any responsibility for the cost of the tickets (however constituted) after the 2008 calendar year but should continue to receive at [Husband's] expense one-half of any season tickets he purchased. The Court declines to hold that the 2007 Orders created a permanent obligation [*alimony in futuro*] on [Husband's] part to pay the required donation to the University and/or to provide to [Wife] one-half of any tickets [Husband] should subsequently purchase.

[Wife] paid the face price of the tickets for the 2008-09 basketball season and received one-half of the tickets. In the subsequent years, [Wife] did not pay one-half of the face value of the tickets to [Husband] and did not receive any tickets. [Husband] is not in contempt of the Court's 2007 Orders with regard to the University of Tennessee tickets.

- 16 -

Ergo, with regard to the basketball season tickets, the trial court found that Husband had not violated the court's prior orders. We agree. The court's October 2007 order provided that Wife would receive one-half of the 2008 basketball tickets if she paid for her share, and that was undisputedly done. Husband has not violated the court's orders concerning these tickets.

Finally, with respect to the parties' joint rental account, Wife argues that Husband made numerous unauthorized withdrawals from that account and wrote checks without obtaining Wife's signature thereon in violation of the trial court's May 2009 order. The trial court in its February 2020 order found that although Husband had written checks without Wife's signature, the majority of those checks were undisputedly used to maintain the parties' properties and therefore were not unauthorized expenses based on the court's previous orders. The court noted that the one exception was a check tendered in the amount of $314,988.45, which was used to pay interest payments and which Wife did not remember having authorized.

In his appellate brief, Husband acknowledges his trial testimony that he wrote a check on June 4, 2009, from the joint rental account in the amount of $314,988.45. Husband testified that this payment was applied toward interest payments for "the airplane," Marbella, Waterview, and his own personal loan. Although Husband asserted that Wife had agreed to these payments, Wife disputed his testimony at trial, stating that she was unaware of the payments, had not agreed to them, and did not sign the check at issue.

In its February 2020 order, however, the trial court stated that Wife had admitted to having "memory issues" and, therefore, the court declined to find that Husband's use of the joint rental account funds in this manner was willfully contemptuous, even though the court found that the use was unauthorized by the court's prior orders. Wife had acknowledged at trial being unable to clearly remember various details from the months or years immediately following the parties' divorce, which Wife explained was due to, *inter alia*, the parties' separation and her move from the marital residence, the death of both of her parents, and the lengthy divorce proceedings. Where the parties' testimony was conflicting, the trial court was forced to make a determination concerning the facts surrounding this large withdrawal.

Although the trial court found Wife to be a credible witness in general, the court was apparently unconvinced that Wife had not agreed to allow Husband to sign her name to the $314,988.45 check. Wife admitted at trial that she had largely acquiesced in Husband's handling of the joint rental account and his maintenance and rental of the parties' properties during the years following the divorce. Wife also admitted that the parties had sometimes signed one another's names to checks drawn on the joint rental account with permission and that she had authorized Husband's assistant to sign her

- 17 -

name in certain instances. Because the trial court is in the best position to judge the parties' credibility during live testimony at trial, we will defer to the court's finding in this regard.

We note that despite its declination to find Husband in contempt for the use of the $314,988.45 check, the trial court did award to Wife a judgment for her proportionate share of those funds, finding Husband's use of the funds to be unauthorized by the court's prior orders. We determine this to be a fair, proper, and equitable resolution of this issue. We accordingly affirm the trial court's determination concerning civil contempt.

IX. Post-Judgment Interest

Wife asserts that the trial court erred in declining to award her post-judgment interest on the funds that Husband retained from the sales of the parties' properties. Wife contends that post-judgment interest is a "mandatory statutory right" based on Tennessee Code Annotated § 47-14-122. As Wife acknowledges in her brief, "post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) (*quoting Poleto v. Consol. Rail Corp.*, 826 F.2d 1270, 1280 (3d Cir. 1987)).

Tennessee Code Annotated § 47-14-122 (2013) provides that "[i]nterest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial" (emphasis added). As this Court has explained concerning post-judgment interest: "Tennessee law requires the payment of postjudgment interest. . . . Thus, the allowance of interest is based upon statute, and this postjudgment interest statute is mandatory." *Vooys v. Turner*, 49 S.W.3d 318, 321-22 (Tenn. Ct. App. 2001).

The trial court found as follows concerning Wife's claim for post-judgment interest:

> Post-judgment interest – [Wife] has asked whether she will be awarded post-judgment interest for sums due her on various pieces of investment property that were sold . . . . If [Wife] is seeking prejudgment interest, the Court has already declined to award it. As to post-judgment interest, there was no judgment for those amounts until the Court's July 2019 Order. There is not yet a final order, so post-judgment interest cannot be accruing. The Court believes that post-judgment interest is a statutory right, but the amount of interest and when that right may accrue cannot be determined until there is a final order.

- 18 -

Wife contends that the trial court should have awarded her post-judgment interest on the sum she was due from the sale of each property beginning on the date that the sales proceeds were received, reasoning that she was deprived of such compensation as of that date. In support of her argument, Wife relies upon this Court's opinion in *Varnadoe v. McGhee*, 149 S.W.3d 644 (Tenn. Ct. App. 2004), because the Court ruled that post-judgment interest should be awarded from the date of the original judgment until it is satisfied even if the amount of damages is later recalculated. We find *Varnadoe* to be distinguishable from the instant case, however, because the *Varnadoe* plaintiff was awarded sum-certain damages in the trial court's original decree, although the amount of damages was subsequently modified following appeal and the resultant proceedings upon remand. *See id*. at 647-48. As the *Varnadoe* Court pointed out, because an "appellate court decision that modifies or reverses a trial court's judgment is given retroactive effect to the day of the original trial court judgment," post-judgment interest would also accrue from the date of the original decree. *See id*. at 649.

In the case at bar, however, Wife was not awarded sum-certain damages until the trial court's July 2019 order, which was not final until entry of the trial court's February 2020 order. Inasmuch as this case presents different circumstances from those present in *Varnadoe*, we determine *Varnadoe* to be inapplicable.

This Court has previously explained that post-judgment interest must be awarded from the date upon which a party is awarded "a sum-certain money judgment from which statutory interest would ordinally accrue." *See Clement v. Clement*, No. W2006-00691-COA-R3-CV, 2007 WL 2318659, at *4 (Tenn. Ct. App. Aug. 15, 2007). Upon review, we find the *Clement* opinion to be more analogous to the case at bar.

In *Clement*, the parties were divorced by final decree entered on September 2, 2003, and in that decree the trial court awarded the parties' marital residence, valued at between $1.4 million and $2.5 million, to the husband, adopting the lower value proferred by the husband's appraiser. *Id*. at *1. During the first appeal, this Court determined that due to problems with the appraisal method utilized, the trial court erred by adopting the value of the marital residence as found by the husband's appraiser. *Id*. This Court also determined that the trial court should have awarded the wife a greater share of the marital estate overall. *Id*. This Court ultimately adopted the higher value of the marital residence as found by the wife's appraiser and ordered that the equity therein be split equally between the parties. *Id*. This Court then remanded the matter to the trial court to determine the "method of payment, such as installment payments or the sale of the house and division of the proceeds." *Id*.

Following issuance of the mandate from this Court in *Clement* but before the trial court could consider the matter on remand, the parties entered into an agreement to sell the former marital residence for $2.1 million. *Id*. at *2. Following the sale and payment of the outstanding mortgage and expenses, the wife received $772,823.02 as her share of

the proceeds. *Id*. The wife subsequently filed a petition in the trial court, arguing that she should have received a greater sum based on a table included in the *Clement* Court's original opinion, outlining that as part of an overall equitable distribution, each party should receive $927,839.00 for his or her share in the former marital residence, which represented one-half of the difference between the appraisal value of over $2.4 million and the outstanding mortgage. *Id*.

The trial court in *Clement* denied the wife's petition, determining that she had received an equal share of the proceeds from the sale of the former marital residence in accordance with the appellate opinion. *Id*. at *3. The wife again appealed to this Court, and this Court affirmed the trial court's determination on the issue. *Id*. The wife also argued on appeal, however, that she should have been awarded post-judgment interest from the date of the 2003 divorce decree forward on her share of the proceeds from the sale of the former marital residence. *Id*. This Court disagreed, noting that "a party's right to postjudgment interest is based on that party's entitlement to use the proceeds of the judgment after the award." *Id*. at *4 (quoting *Vooys*, 49 S.W.3d at 322). The *Clement* Court further elucidated:

> In the instant case, as noted above, the award to Ms. Clement was not a sum-certain money judgment from which statutory interest would ordinarily accrue, and Ms. Clement did not have a right to the use of the proceeds representing her interest in the property until either the trial court determined a proper method of payment or the property was sold. Accordingly, we find no merit in this argument.

*Id*. at *4. This Court therefore denied the wife's request for post-judgment interest from the date of the 2003 divorce decree forward on her share of the proceeds from the sale of the former marital residence. *Id*.

Similarly, here, Wife was not awarded a sum-certain money judgment until entry of the trial court's final order on February 4, 2020. Although Wife was certainly entitled to share in the proceeds of the sale of the marital properties from the dates they were sold pursuant to the trial court's prior orders, Husband was also entitled to be reimbursed for certain expenses he personally paid to maintain those properties pursuant to the prior orders of the court. Because of the length of time before certain properties were sold and inasmuch as the parties were unable to come to terms concerning an accounting of the expenses and proceeds, no sum-certain money judgment was owed to Wife until entry of the trial court's February 2020 order, which ultimately unraveled the tangled knot of monies received and expenses paid. As the trial court noted in its July 2019 order: "Had the Court held in [Husband's] favor on some of his claims for credit, [Wife] would have owed [Husband] money."

The trial court further explained in the July 2019 order:

[N]either party has followed the previous Order of this Court. At times, [Husband] kept the proceeds from a sale; sometimes he provided the funds to [Wife]; other times, the parties split the proceeds. In short, the parties acted as they pleased in disregard of the Court's order.

Following our review of the evidence, we agree with this characterization. Although Husband appeared to control the marketing of the various properties and payment of most expenses, Wife acquiesced in his decision-making until such time as the parties' relationship ceased to be agreeable and never sought court intervention until the filing of her contempt petitions. Until the resultant accounting performed by the trial court and its determination regarding whom was owed a judgment and in what amount, no sum certain had been awarded to either party. We therefore determine that Wife was not entitled to post-judgment interest dating back to the sales of the various properties.[4]

## X. Rental Value of Marital Residence

Wife contends that the trial court erred by failing to award her one-half of the fair market rental value of the Old Kent Drive property from the date of the parties' divorce until the date of trial because Husband solely used and occupied the property, both as a residence and, intermittently, as an office location for his law firm. Concerning this claim, the trial court found as follows:

> The Court cannot find that [Wife] is entitled to recover on her claim for the rental value of the home from the point of the parties' divorce through the present. While [Husband] did almost exclusively utilize the home, [Wife] made infrequent use of the home and was never denied access. Further, she did not request the property be auctioned prior to the action commenced in 2016.

The evidence supports these findings.

Wife testified that when the Old Kent Drive property was marketed previously, it did not show well because Husband's law office activities were being carried on there. Wife also claimed that certain repairs needed to be undertaken and that Husband had, at one time, refused to fix these items. Wife acknowledged that since the divorce, she had spent nights at the Old Kent Drive property "for family occasions" and that she had access to the property, at least for a majority of the time, although she stated that she would never enter the home without Husband's permission because he was living there.

---

[4] Wife would be statutorily entitled to post-judgment interest from the date of the trial court's February 2020 order to the date that such judgment is fully paid.

- 21 -

At the outset, we note that no proof was presented that the parties ever entered into an enforceable agreement for Husband to pay Wife rent for his use of the Old Kent Drive property. Although Wife claimed that Husband had mentioned such, she presented no evidence of a written rental agreement. We further note that the trial court's previous orders also did not address payment of rent.

In her appellate brief, however, Wife argues that a tenant in common can be found to owe rent to a co-tenant in certain circumstances, such as when "the occupying tenant claims the ownership of the entire property and keeps his co-tenant out of possession," *see Renshaw v. First Nat'l Bank*, 63 S.W. 194, 208 (Tenn. Ch. App. 1900), or when a co-tenant can demonstrate that the occupying tenant "has made a profit over and above the mere use, and beyond his share," *see Tyner v. Fenner*, 72 Tenn. 469, 474, 1880 WL 4530, at *2 (1880). Assuming, *arguendo*, that this authority still represents an accurate recitation of the applicable law, we find these cases to be distinguishable and Wife's arguments, therefore, unavailing.

With regard to *Renshaw*, in this matter, Wife failed to establish that Husband had kept Wife "out of possession" of the Old Kent Drive property. *See, e.g.*, 63 S.W. at 208. Wife testified that she vacated the property prior to the parties' divorce and moved to Chattanooga. In the ensuing years, Wife acknowledged that she spent time at the Old Kent Drive property for family occasions and when her relationship with Husband was amicable. Wife further admitted that she had a means of access to the property throughout a majority of the years since the divorce, even though she claimed she did not take advantage of that privilege.

We further note that pursuant to the trial court's previous order, Wife had the ability to seek an auction of the property when it had not been sold within eight months after the parties' divorce. Clearly, Wife failed to avail herself of this court-ordered remedy. As our Supreme Court explained nearly a century ago, "[e]quity aids the vigilant, not those who sleep on their rights." *Winters v. Allen*, 62 S.W.2d 51, 52 (Tenn. 1933). Based on the facts of this case, we do not find that Husband's "exclusive" possession of the Old Kent Drive property was a basis for awarding one-half of its fair market rental value to Wife.

Moreover, respecting the *Tyner* opinion, we must consider the above-quoted sentence in context. As our Supreme Court explained in *Tyner*:

> The mere fact of one tenant having occupied the property will not of itself make him liable for an occupation rent. The effect of such a rule would be that one tenant in common, by keeping out of the actual occupation of the premises, might convert the other into his bailiff, and prevent him from occupying them except upon the terms of paying rent. It must be distinctly shown that he has made a profit over and above the mere use, and beyond

- 22 -

his share. It is the actual receipt of such excess which creates the liability; and, as the claim is not of strict legal right, if he is charged with an occupation rent, he should be allowed such usual repairs as a prudent landlord would make on his own property, or allow to the tenant as a deduction from the rent, and for permanent improvements, as an offset to the occupation rent.

*Tyner*, 72 Tenn. at 473-74 (internal citations omitted).

Here, Wife failed to show that Husband was in "actual receipt" of excess funds or that he profited beyond the mere use of the residence. Furthermore, if we were to follow the directives of *Tyner*, we would be compelled to remand this matter to the trial court for a determination of what Husband should be allowed to claim as "usual repairs" or "permanent improvements" as an offset to the rent owed to Wife. The trial court denied Husband's claims for reimbursement of utility costs, lawn care, pool care, pest control, insurance, alleged HOA fees, and repairs.[5] Ergo, the trial court neither awarded to Wife one-half of the fair market rental value nor awarded to Husband reimbursement of one-half of his claimed expenses related to the Old Kent Drive property, aside from property taxes, finding that such "costs were related to Mr. Ball's residence in the home." We conclude that the trial court's approach was supported by applicable law and the evidence, and we accordingly affirm the court's decision.

## XI. Effect of QDRO

Wife posits that the trial court erred in failing to determine that the payment she received from Husband's pension fund pursuant to the parties' agreed QDRO was a gift. Although Wife acknowledges that a portion of the money she received from the pension fund was to intended to provide her with her one-half share of the sale proceeds from the Waterview condominium, such proceeds having been deposited into the pension fund, she argues that anything she received over and above that amount was "out of the goodness of" Husband's heart, as he stated in his deposition. We note, however, that when questioned concerning this statement during trial, Husband claimed that he had made the statement in "jest." By way of explanation, Husband articulated that although the trial court had initially awarded the pension fund to him, the court had also determined the Florida properties to be marital, including those held by the pension fund. Therefore, according to Husband, when the marital properties attendant to the pension fund were sold, he believed that he should pay Wife her share of the proceeds of those properties from the pension fund.

---

[5] Wife acknowledged at trial that Husband had made many repairs and improvements to the Old Kent Drive property in recent years, as did her appraiser, Kevin Woodford, who testified that those improvements had increased the property's value.

The trial court found as follows concerning the sale of the Waterview condominium and the resulting payment Wife received pursuant to the agreed QDRO:

> This interest [Waterview] was actually held by the Gordon Ball Pension Fund. At trial, it was established that the employees of [Husband's] firm also had an interest in the funds and assets in the account. [Husband's] first attempt to pay [Wife] for her interest in the property did not comply with the Internal Revenue Service requirements and the parties were obligated to pay back to the pension fund a sum in excess of the amount they received. [Wife] paid back $927.11 from her own funds. She seeks to be reimbursed this amount due to the fact that the failure to comply with IRS rules relating to division of pension assets was [Husband's] fault and she should be held harmless therefrom. . . . The property was sold on January 17, 2012 for $774,000.00. The net proceeds were $728,378.44. [Wife] received $431,098.82 of the proceeds; [Husband] received $297,279.62. The Court does not accept [Wife's] argument that the amount she received beyond one-half constitutes a gift. She was owed what she was owed and received more than she was entitled to from an overpayment. [Husband] testified that as the properties were sold, he got all the proceeds from one, she got the proceeds from another, and they split some of the proceeds. [Wife] did not refute this testimony. [Wife] received **$66,909.60** more than [Husband].

Wife explained that although the Waterview condominium was originally jointly titled in the parties' names, the parties later transferred title of the property to Husband's pension fund. Significantly, Wife acknowledged that after the sale of the Waterview condominium, the proceeds from which were deposited into the pension fund, Husband tendered her a check from the pension fund for $570,000.00. Wife also testified that she was told by her accountant some months later that she needed to repay that money to the pension fund, plus interest of $927.11, in order to avoid any issue with the IRS. Wife therefore repaid $570,927.11 to the pension fund. Husband did not dispute this testimony.

While still testifying concerning the Waterview sales proceeds, Wife also acknowledged that she subsequently received a distribution from the pension fund in the amount of $431,098.82. Although she admitted that this amount was greater than what she felt she was owed for her share of the Waterview proceeds, Wife opined that she did not feel that she owed Husband a credit for the difference. When asked to explain the reason for her answer, Wife stated: "Well, he kind of borrowed from Peter to pay Paul. No, I do not feel like that. . . . But it just depends on how you look at it."

Reviewing the evidence that was presented, we conclude that the trial court properly accounted for the funds that Wife received from the pension plan. We note that

one of the "formal requirements of a gift [is] the intention by the donor to make a present gift . . . ." *Hansel v. Hansel*, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996). In this matter, Wife proffered no credible evidence to demonstrate that Husband intended to effect a gift by entering into the QDRO and distributing funds to her from the pension plan in order to provide Wife with a portion of the proceeds from the sale of Waterview. This issue is without merit.

## XII. Poolside Taxes

Finally, Wife argues that the trial court erred by awarding to Husband credit for paying the taxes for the Poolside condominium when she demonstrated that all such taxes were either paid from the joint rental account, paid by her, or paid from the sale of the property. As previously discussed, the trial court found as follows with regard to the Poolside taxes:

> [Husband] claims a credit due to him for property taxes paid from 2007-2015 in the amount of $25,547.22. Of that sum, $14,851.64 came from the parties' joint rental account for the 2007-2009 taxes. Of that amount, $2,813.33 was late fees and interest, a cost for which [Husband] is not entitled to credit and for which [Wife] should not be responsible. [Husband's] net credit is $7,882.25. [Wife] paid the taxes for 2010, 2011, 2012, and 2014 in the amount of $8,714.03. The property taxes in 2013 were paid from the proceeds of sale and do not need to be addressed. The end result of property taxes for Poolside is that [Wife] paid **$831.78** more in property taxes than [Husband] paid and she is credited that amount.

Although the majority of the trial court's findings are supported by the evidence, we agree with Wife's assertion that the trial court's ruling contains a minor error affecting the overall judgment.

As the trial court noted, Wife paid the property taxes on the Poolside condominium for 2010, 2011, 2012, and 2014 in the amount of $8,714.03. The trial court gave Wife a credit for the difference between this amount and Husband's "net credit of $7,882.25." However, Husband was not due a "net credit" for those years because he did not pay the taxes—Wife did. In other words, for the years 2007 through the property's date of sale in 2015, Husband personally paid no taxes for the Poolside condominium because he acknowledged at trial that property taxes for those years were either paid from the parties' joint rental account (2007-2009), for which no credit to Husband would be due; paid at closing (2013 and 2015), for which no credit to Husband would be due; or paid personally by Wife (2010-2012 and 2014) such that she should be reimbursed for one-half of the amount. As such, there was no factual basis for the trial court's finding that Husband was entitled to a "net credit of $7,882.25."

Wife demonstrated that the only payment of Poolside property taxes for the years 2007-2015 that did not come from joint funds or proceeds was her payment, made solely from her personal funds, in the total amount of $8,714.03. Therefore, she should be due a credit of one-half that amount, or $4,357.02, instead of a credit of $831.78. We accordingly modify the judgment owed to Wife by adding an additional $3,525.24 to the total due to Wife from Husband ($4357.02 - $831.78 = $3,525.24).

XIII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment with two modifications, which have the effect of increasing Wife's award by $18,525.24, rendering a total judgment awarded to Wife in the amount of $225,393.91 rather than $206,868.67. The trial court's judgment is affirmed in all other respects. We remand this case for enforcement of the judgment as modified and collection of costs below. Costs on appeal are taxed to the appellant, William Gordon Ball.

s/ Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE